All right, sir, we're ready when you are, Mr. Secretary. Good morning, Your Honors. David Schexnayder representing the plaintiffs. I was the counsel below. The main error that we are contending is that the trial judge did not accept the allegations of the plaintiffs as true on a Rule 12b motion to dismiss. And you can see it all starts in the opinion on page 7 when the judge is discussing state action. And he begins by focusing on, he repeats what the plaintiffs allege, simply stating that those were the allegations. But then he goes right into what Shriners contends. Shriners contends that the termination decision was unmoored from any responsibilities it may have as a medical provider. Instead, Shriners terminated based on what it believed was their COVID-19 vaccination policy. Those are Shriners' allegations. And what the judge did was stated on page 9, Shriners' position is clearly supported by both language and statute in the case law. That's not proper on a motion to dismiss. On a motion to dismiss, the plaintiffs' allegations are supposed to be accepted as true. And what the plaintiffs have alleged here is that state action is present on behalf of Shriners because what are we dealing with? We're dealing with drugs that were available to the public that were only emergency use authorization, covered by the PrEP Act, and deemed by the FDA as being investigational. All of those drugs were only available to the plaintiffs and anyone else through the CDC vaccination program. The federal government owned all of these drugs. The federal government owed constitutional obligations to any potential recipient of these drugs. Those duties flowed from the executive branch of the federal government, who purchased all of these drugs, down to each state because the CDC program was designed to be administered through each state's immunization cooperative agreement that they had with the federal government. In Texas, Cecile Irwin Young was the person that was designated to enforce this program to ensure that the recruited parties did what they were supposed to do under the program. In Texas, one of the recruited parties was Shriners. Shriners signed the CDC provider agreement. Shriners agreed to perform the obligations that the federal government owed and that the state government owed. So when Shriners is dealing with anyone, interacting with anyone, employees or non-employees, regarding these drugs, they are bound by the same duties that the federal government had and the state government had. And those are constitutional obligations, and they are federal statutory obligations, and they are programmatic benefits that are included in the CDC program. So when looking at the plaintiff's allegations and taking all of those as true, Shriners is acting under color of law for purposes of a 1983 action. Oh, Counsel, you're obviously an advocate and you're in your best shot, but it does seem to me there's a considerable difference between taking the facts as alleged in the complaint in the light most favorable to the plaintiff and the legal significance of those facts. And I think you're crossing potentially the line there as to what the meaning of your allegations are. And that's a lot of what Judge Brown, I think, was dealing with, though maybe he didn't always use the proper language. Well, Judge Brown didn't even address the CDC program. He didn't even address the—we went in specific detail about what the FDA and the CDC put out as—they called it the CDC playbook. I mean, these are specific instructions to volunteers like Shriners and the state governments about how this program is supposed to be implemented. And one of the main things is any potential recipient of these drugs has the right to  Any person who is confronted with these drugs under the PREP Act immunity, PREP Act says that you are to be informed of the voluntary nature of the program. Counsel, you several times in your brief, I think, but it stands out, maybe it was just once in bold print, but probably not, you say that these variety of authorities and also the Jacobson case indicate that there's a right to refuse to take a vaccination without consequences or some word like that. And I just don't see any authority for that. It's one thing to say that any of this guidance says that a subject can refuse the vaccination. It's something else to say there cannot be consequences attached to that. And in Jacobson, there's a five dollar fine. Of course, it's the math. I think it's over a hundred dollars now, equivalent today. And so even in that seminal case in your argument, maybe that's unfair characterization. There was a consequence. So what are you relying on to say, which is going a little afield from what you're saying? But I do think it's what you're arguing right there. But I think it's a fundamental point you're trying to convince us of that there cannot be consequences to the refusal to take the vaccination. What's the support for that? Yes. First of all, these drugs are not vaccines. They're not vaccinations. The drugs that were available in the marketplace at the time and all all times pertinent to this case had no legal indication for anything, especially a vaccine. In fact, the FDA advised through their EUAs that these drugs had no legal indication for a vaccine. So so this is very different than any case that involves an FDA. Licensed vaccine. So that's one difference. Secondly, the Jacobson case, as you know, back in 1905, there was no EUA statute. There was no prep act. There was no looking for authority you have. You're trying to extrapolate from that. And that's fine. You're distinguishing them. But what authority is on the other side that there's a right to refuse to take a vaccination, depending on circumstances, without consequence to the subject? OK, because if you look at the EUA statute and it says that that any potential recipient has the option to refuse the product and when it says that they are to be advised of the consequences of not taking them, then you look to the guidance again from the CDC and you look to the fact sheet that is supposed to be handed to any potential recipient. And that fact sheet specifically says it's in a question and answer format. What if I do not wish to take this vaccine or this product? It says specifically you have that it is your choice to take it or not take it. And if you don't, it the only consequence is it will not change your standard of care. A second answer to your question, your honor, is. The the enforcement provisions are in 21 U.S. C. 337, the enforcement, the prohibited acts are listed in Section 331. Nowhere in the prohibited acts that are to be enforced by the enforcement provision contain that someone will be penalized for exercising their right to refuse. It's simply things like introduction and delivery of interstate commerce, misbranded food, the introduction or delivery into interstate commerce under 360 BBB three. So if you look at each one of the the prohibited acts under 331, you will not find that someone can be penalized for exercising their right to refuse. And isn't that. That that's just elementary in our law that before someone can be punished, there must be notification of what that punishment is. What action must be taken in order to be punished? And nowhere does it say anywhere in the EUA statute, in the prep act, in the CDC program, in the CDC playbook. Nowhere does it say that anyone can be penalized for exercising their right to refuse. And again, we have made these factual allegations. They were not accepted as true. And that's the fundamental error, because that error flows through the entire opinion. So it flows to Ms. Young, because you can see what the judge did in his opinion. We we had 19 paragraphs addressing the duties that Ms. Young owed to the people of Texas and what she was supposed to do, how she was supposed to administer this program, how she was supposed to enforce the rules. He picked out four words in one paragraph to justify the dismissal of Ms. Young, and all he said was, well, since I'm dismissing Shriners, I'm also going to dismiss Ms. Young. And it was based on his assumption that this was an employer vaccination mandate of an FDA licensed drug, and that is not those are not the allegations that we've made. And because he did not accept and specifically accepted the defendant's version, that's reversible error on a 12B motion to dismiss. That's why we're here. We're here on a motion to dismiss, not like the last case after a motion for summary judgment. So the plaintiffs should have the opportunity to prove and to bring into court. In fact, in our in our in the amended complaint we filed, we had 12 exhibits attached to the to the to the complaint to support the allegations that are supposed to be accepted as true. But we're not. What did Judge Brown do? He forced us to strike a lot of those exhibits, reduced the petition down to 40 pages and limit. And then we had only four exhibits. So the judge should have acted. What was your original petition? It was over 100 pages, Your Honor. But the issues involved in this case are, first of all, novel, unique. It talks about three different federal statutes, a comprehensive CDC program with a playbook that describes the duties. So we set forth in the record facts if accepted as true would result in a ruling in favor of the plaintiffs. And unfortunately, the judge did not accept those as true. This is not an employer vaccination mandate, because what the CDC program does, it creates a legal environment that anyone who is subjected to these drugs must is subjected to. They must become human subjects in federally funded research. What is research? Research is simply, research is not limited to only a clinical research. Research, as it is defined in the CFR, is anything that contributes to the generalizable knowledge of a product. And what happens here, you go in, you give your private identifiable health information, you waive your due process rights to sue anybody if you happen to be injured by taking this product or the administration of this product. You accept increased health and safety risks. And they monitor you. They report the data to the government. You have to come back for a second shot. They log that. If they monitor you for adverse reactions, if there are any, it's reported to the government. That does not happen with FDA licensed drugs. If you go into your doctor and you get it, you get your shot and you leave, they keep records in their, in the doctor's office. That's not reported to the federal government and kept in a database and followed up with you. This is a, this is a very different program. That's why it's not a mere employer vaccination program. The CDC program is supposed to be 100% voluntary. The drugs are owned by the government until they are administered. And because of that, it's, it distinguishes them from regular FDA licensed drugs and it carries with it constitutional and federal statutory obligations. I see that my time is running low. Is there any questions that I'm going to reserve the balance of my time for rebuttal? Thank you. Yeah. I have one question. Should this dismissal be with or without prejudice? Your Honor, the dismissal should be without prejudice. And if there are any concerns that the president of the United States is did not provide sufficient factual information, we should get a, uh, an opportunity to amend the complaint and make those factual allegations. So it should be without prejudice and leave to amend. But what we ask is that we, that this court reverse and render and see that, that what we have done is plead plausible causes of action. Well, let me just ask you in part, um, this was the, with the second, well, you told me the first complaint was a hundred plus pages with the exhibits Judge Brown ordered. So it was pared down to 40 something, so assuming let's say discussion, uh, a reversal or vacation on it without prejudice to amend. I guess my question is if you had a chance to amend, would you just seek to put those other 60 something pages that you had in originally as your position of, well, I don't agree what you said was missing, but if you'd left in my 60 pages, you know, I wouldn't be, I mean, those are sort of my words. I'm just trying to visualize it, whether the things that were excluded, you know, the 60, whether those go to any of the defects, if you will, here in your or not withstanding that your position would be kind of what it is that even with that, it still doesn't cure what you're arguing the error of Judge Brown. You understand kind of for purposes of amending your honor, what we would do is we would look at the court's opinion. If it believed that we did not, um, state of cause of action or please sufficient facts to do so, we would, we would consider the opinion and then amend in accordance with that as it stands. Now, we believe we stated the cause of action based on the facts that are supposed to be accepted as true. Gotcha. Okay. Thank you. All right. Mr. Burke, I believe we're hearing from you. Good morning and may it please the court. My name is Mike Burke and I am here on behalf of the Shriners Parties in this case. As the district court noted in the opening line of its order below, this case involves the interplay between a private nonprofit hospital role on the one hand as a public health provider, and on the other hand, its role as a private employer. And while wearing the hat of a private employer during the time of a global pandemic, Shriners made the decision to implement and enact an employment was designed to protect the vulnerable patient population that the hospital cares for, which includes children with severe orthopedic issues, burn injuries and spinal cord injuries and their families, as well as protect the health and safety of Shriners employees and contractors. Mr. Burke, I assume you and your colleague at your table thought that none of what we're hearing from plaintiffs was quite the way you would present the case. You're presenting that now. I also want you, though, to make sure you cover personal jurisdiction. It seems to me that there's a significant problem here and I don't totally agree that Judge Brown got it all right. And so I do think you need to address, and I'll get to what my concern is, basically the fiduciary shield doctrine. But I'm just prefacing or adding to what you're addressing. Make sure you work in that. I'll ask you some questions about that. Certainly, Your Honor.              Before I proceed to the Rule 12B-6 motion, I'd like to answer a couple questions that the court has asked of Mr. Schechtschneider. Number one, I would agree with you, Judge Southwick, that while the appellants spent a lot of time arguing and discussing the CDC COVID vaccination program, there were a lot of facts, there were a lot of conclusion and legal argument, and those are the things that the district court rightly ignored at the 12B-6 stage. Number two, to answer your question about authority for this supposed right to refuse without any consequence, the Third Circuit addressed that very argument in the Children's Health Defense, Inc. v. Rutgers case. And the Third Circuit said that there is no such right. The EUA statute, which instructs the Secretary of Health and Human Services to make sure there are measures in place that patients who present for administration of an EUA drug are given the information that they're supposed to be given, and that they be informed of the consequences of refusing the EUA drug. And so if there are consequences of refusing it, it can't be true that there is a right to refuse without any consequence whatsoever. Well, the addition that opposing counsel made to that is that those consequences must be set out as some form of due process, I suppose, and the consequences in the forms that he was talking about would not include being terminated from employment. Well, in order for the EUA statute to apply, Your Honor, and Norris v. Stanley from the Sixth Circuit addressed this issue, the EUA statute does not apply, in the facts of this case, when Shriners is wearing its hat as a health provider and participating in the CDC COVID program, interacting with patients. Excuse me, that's when it does apply. It does not apply to the situation when Shriners is acting as an employer with its employees. And there are no facts. I'm sorry. What relevance does it have that the government owns the drugs? I don't think it has any relevance, Your Honor, because I think as the district court correctly pointed out, what Shriners may or may not have done while wearing its hat as a health provider as part of the CDC program is beside the point. The proper question is, was there state action involved in the decision to enforce the COVID-19 policy and terminate the appellant's employment? And so what involvement the government had or did not have in the CDC vaccination program is beside the point. And Judge Stewart, to answer your question, there were actually three complaints in this case. The original complaint was over 100 pages with a number of exhibits. The second complaint was somewhere around 80 pages, and I believe it had over 200 pages of exhibits. And then the second amended complaint, which Judge Brown ordered the appellants to file after a Rule 12e motion, was 39 pages with exhibits after that. So the appellants have had three opportunities to this point to plead the facts that are necessary in order to state a plausible claim, and they have not done that yet. And I believe the reason why Judge Brown dismissed with prejudice was because number one, they'd been given those opportunities, and number two, it would have been futile. I don't think there are a set of facts that could be pled consistent with Rule 11 that would plausibly state a claim that the state was at all involved in Shriners' enforcement of its COVID-19 policy. Is that your answer to the question about whether it should be modified from with prejudice to without prejudice? Yes, Judge. We think the with prejudice dismissal was proper. Okay. If he assumed . . . the counsel opposite makes a very fervent argument that no matter how many pages, but within the pages, we've done what the law requires, blah, blah, blah, so there's that. So assuming, arguendo, sent it back or whatever, without prejudice, he won't agree that what he filed initially wasn't sufficient, but presumably in order to stay in court, he would, as he say, do what he needs to do without giving up a thought, but do what he needs to do so he can get to the next step. I'm not trying to put words in his head, but it's not conceding the position that what I did initially wasn't sufficient, but if I bounce back, rather than keep beating that wall, I'll put things in here that get me in the court so I can get to the next stage, assuming that would be strategic. So wouldn't that somewhat militate against, notwithstanding what you said, a dismissal with prejudice, so he is going to never get that shot? I know what you said, you said four shots, but I mean, 12B is a little harsh. Certainly, Your Honor. And as he says, it's a novel issue. It's not the heartland. I mean, you know, it's different. 12B isn't different, but admittedly, this is not the normal territory, right? So on a 12B, I mean, is there something to . . . I'm not talking about equity. I'm just saying, shaking out there on a dismissal would, without prejudice, be meaningful in this context, so maybe he can't, but if he can, should that not be there? I don't think so, Your Honor, because there weren't any facts essentially alleged in any of the versions of the complaint, and so I don't know that adding the pages from the original complaint would change it. Well, I know, but that's what I'm saying. He would take the position, he's already done it, but I'm saying if we bounce it back and say, you know, should be dismissed without prejudice, I'm just saying if counsel opposes, you know, holds his breath and just says, I shouldn't have to do this, but the only way I'm going to get to the next step, I got to put in some stuff to get there, and I'm just saying on a 12B, what's wrong with that, without prejudice? If he doesn't do it, he just bounces back out, right? Well, I think you're right. I know you say no, I'm just teasing the question out. I haven't really thought about it, because this one is, has so many pages, et cetera, et cetera, but I'm clear counsel would say we've done it. Well, I will point out that the first time the appellants amended their complaint, it was voluntary. Before we filed our Rule 12B-6 motion, I confirmed with Mr. Schexnayer about it, and they agreed to reduce their complaint from the 111 pages to the, I believe, 80 some odd pages for the first amendment complaint. Let me ask you about personal jurisdiction against these individuals. The district judge used the fiduciary shield doctrine. It seems to me there's some problems with that. I don't know if you need it, and I don't know which way you would think is the preferable way to go, but it does seem to me there's some question on a Texas law, A, whether it's even recognized. Intermediate courts have talked about it. We've talked about it some. B, whether it applies to tort actions, and whether what we're dealing with here is in the nature of a tort action under 1983 or something else, and whether it applies to specific jurisdiction or to general jurisdiction. So, can you address fiduciary shield and whether it's even necessary to get there? Well, I think, first of all, there were . . . Texas courts do recognize fiduciary shield doctrine, and I understand that . . . I'll say it again. Who recognizes it? Texas courts, Your Honor. Well, all I'm saying is I'm not sure that's settled. I don't know if the Texas Supreme Court has ever talked about it. There are intermediate courts that have talked about it. I think you're correct about that, Judge Southwick. I know that the appellants argue that the court did not consider the tort exception to the fiduciary shield doctrine. But I would argue, again, in order to plausibly allege a tort, there would have to be allegations in the complaint that these individuals, separate and apart from the entity, had any interaction with the state of Texas when they developed this policy in Florida and then that policy was then carried out in Texas by others at the Galveston facility. There's simply no facts pled in any of the iterations of the complaint that that ever took place. And so, while they may have alleged a tort, I don't think they've plausibly alleged enough facts that would withstand that. Scrutiny. And the fact that none of the Shriners' individuals or residents of the form state Texas is undisputed. And there are no facts that they were ever in Texas or had anything to do with the terminations of the appellants in this case. Well, which makes me wonder if fiduciary shield really is the better way to go or whether just personal jurisdiction generally over these four individuals or however many there are, five individuals, has not been shown. I think the result would be the same either way, Judge. Well, it would be if we agree with one of them. That's correct, Judge. All right. There are two primary reasons why the district court granted the 12B6 motion below and why this court should affirm. The first basis which I've touched on is that the appellants are focusing on the wrong issue. As the district court correctly noted, the first thing that a court should do when reviewing state action is look at the challenged conduct. And in this case, it's the termination of the appellant's employment, not anything that Shriners may have done with regard to the CDC program. The court relied on this court's case in Cornish v. Correctional Services Corporation for that proposition, which itself relied on the United States Supreme Court case, Rendell Baker v. Cone in 1982. Both of those cases stand for the proposition that even when an entity wearing one hat may or may not be involved in state action when performing their operational activities, the real question is to look at the termination decision itself and was there any state involvement in that decision. And I believe that Judge Brown correctly concluded in this case that there were no allegations that the state was at all involved in enacting or enforcing the COVID-19 policy. Very recently, and this is a case that we submitted to the court in our 28J letter last week, another panel of this court followed the same analysis in a case that is substantively identical to this one. It's the Giuliopoli v. Boom case. Again, the site is in our 28J letter. In that case, Houston Methodist had a virtually identical COVID-19 policy that it enforced. The plaintiff in that case brought an action under Section 1983, and the panel decided based on Cornish that the interaction between the hospital and those to whom it's enforcing the COVID-19 policy is the correct conduct and issue to look at, and there was an absence of any facts whatsoever, just as in this case, that there were any facts that the state was involved in that. The second reason the district court's order below was correct is because every court in the nation that I'm aware of, and it's unanimous, that has reviewed any of these provisions that the appellants rely upon in this case, has said that none of them provide a cause of action for the plaintiffs to vindicate any rights either under the provisions themselves or under Section 1983. That includes five cases alone with appellants counsel who sued private health care companies alleging 1983 claims, and the courts have held that none of these provisions provide appellants that type of relief. And talking about prejudice versus not prejudice on dismissal, the judge, Judge Brown, declined to exercise jurisdiction over state law claims. So if he didn't exercise jurisdiction on it over them, how could he deal with prejudice? Shouldn't those be without prejudice? That may be correct, Judge. He's basically saying I'm not going to deal with these. He deals with them. He says you can't file them anywhere else. I'm not sure that order was part of the appeal in this case. I don't think the appellants appealed the dismissal of the state law claims, but you may be very well correct on that, Judge. Good question. All right, Counsel. Thank you, Your Honor. I'll just ask that the Court affirm and fold. Thank you. All right. Thank you, sir. Hold it a minute, sir. I know you're anxious, but buckle your seat belt back up. He's talking about your co-counsel coming behind you. Buckle your seat belt back up. We'll give you your shot. All right, Mr. Farrell. He's trying to take my five minutes. May it please the Court. He just wanted to get back up there and say why you all are wrong and bad wrong at that, so that's all. My name is William Farrell, and I represent Cecil Irwin Young, who's the Executive Commissioner for Health and Human Services. And to answer, I think, one of your questions earlier, Judge Southwick, is there is no clearly established right to refuse the vaccine, as Appellants' Counsel argues in this case. And that is the fatal flaw underpinning all of their arguments, the first of which is Ms. Young is entitled to rely on qualified immunity unless Appellants can show that she violated a clearly established right that she knew or reasonably should have known. And since there are no, every court that has looked at this issue around the country has determined that there is no fundamental or constitutional rights involved. And then when you move into the 1983 claims, everything that Appellants allege is premised upon Shriners' alleged failure to intervene and coerce or intervene in constitutional violations that were committed by Shriners. And I agree with my colleague, Mr. Burke, that if there aren't any violations of a fundamental right committed by Shriners, then there is no duty to intervene in anything, which then goes to the 1983 claims. Appellants want to argue Ms. Young's inaction is what creates their 1983 claim. But this court, and Thompson has already held personal involvement, is an essential element of a 1983 claim. I'm intrigued, if I understand the briefing right, that Commissioner Young asserted a lack of standing, no traceability probably, in district court, but has not renewed that on appeal. Is that correct, that argument? I believe that's correct, Your Honor. I won't press it. It is a jurisdictional issue. We'll have to make sure that there's standing. But that's not part of the argument. That's fine. I believe it was . . . I don't believe they addressed that in the opinion. Judge Brown did not address it, you're saying? I don't think he addressed standing. I think it was . . . I don't recall. It was a very brief dismissal of the claims against your client, so I don't think it got to standing. Yes, Your Honor. And it was very brief against my client, because, again, it goes back to the arguments we just heard related to Shriners. If appellants don't have a valid claim against Shriners, there is no valid claim against Ms. Young as the Director of Health and Human Services, because her duties were to ensure that those facilities within the state during that time that were providing vaccinations were doing it in accordance with federal regulations. And none of the appellants, obviously, in this case, received the vaccination. It seems to me the standing and traceability issue ties into the argument you both are making, which is this is not an argument about the vaccine, this is an argument about the employer deciding to terminate somebody for not taking the vaccine or for the emergency medication. And it seems to me the Commissioner's duties are probably towards how the vaccine program is administered and not what employers do in their piece of working with these employees who have or have not been vaccinated. So I do see traceability as at least a question here. If the Commissioner, I mean, is there any argument that's been made that the Commissioner would have authority to inform employers they cannot dismiss anybody for refusal to take the exam? Is there an exam to take the vaccine? No, Your Honor. And that's probably the heart of my client's defense is this case is about an internal policy of Shriners to institute a condition of employment. This really has nothing to do with the actual vaccination program that was going on around the country at that time. That is not state action. Well, if Commissioner Young had entered such an order, no employer can refuse or no employer can terminate an employee who refuses to take this exam, take this vaccine. I don't know what's wrong with me. This vaccine, would that have been enforceable? Would she have had the authority to do that? I don't believe it would have been enforceable because she doesn't have the authority to do that. All right, Counsel. Thank you. Thank you. I don't miss the sex out of you. Better roll. Judge Southwick, we're not talking about just any employers. We're talking about employers who signed the CDC provider agreement, employers who specifically came forward and said, yes, we would like to distribute these drugs. Well, where would her authority come from? That's what you're saying that she should have done. It comes through the CDC program because. By implication. No, no, directly, specifically. The state of Texas and specifically Cecile Irwin Young, as the designee for Texas, is the emergency response stakeholder under the CDC program. Shriners has come in and agreed to be the organization and the vaccination provider. There are specific duties that are assigned to those roles. Ms. Young failed in her duties as the emergency response stakeholder to ensure that each organization, each vaccination provider, did exactly what they were supposed to do under the agreement. And under the agreement, that means that you cannot deprive someone of their statutory right to  And again, these are not vaccinations. There is no drug on the market at the time that had a, because in order to be a vaccine, you have to have a legal indication for that. There is no legal indication for that. Once it's approved, then it does have a legal indication. But before that legal indication, there are certain rights and responsibilities that the distributor must abide by. And that's what we're talking about here. We're not talking about just a general employer who didn't sign the agreement and is attempting to get their employees injected with an FDA licensed drug. That is completely different than what we're talking about here. They talked about different hats for the employers. There is nothing in the CDC program and provider agreement that says to Shriners or any other signatory that says, you know, these duties apply to you and everyone you come in contact with except your employees. And if there are two hats, the hat that is put on their head from this CDC program prevails because it is federal law. It implicates constitutional duties. When they talk about, oh, well, there's no clearly established right, the Constitution is clearly established. The Kruzan case is clearly established that people can refuse unwanted medical treatment. That's what this is in this case. Contract law is clearly established. That's what we're dealing with here. The duties that are established by the CDC provider agreement, which was signed by Shriners, which was agreed to be enforced by Ms. Young and the state of Texas. Judge Southwick, you asked the significance of the federal government owning the drugs. The significance is they set the rules. They set the rules. And if you allow this to happen, if you allow a signatory to the agreement to deprive someone of their rights to refuse, that strips the secretary of the HHS of his sole responsibility under the statute. In paragraph L, 21 U.S.C. 360 BBB 3, paragraph L, only the HHS secretary has the ability to determine who does and does not comply with these, the provisions of this statute. So, yes, it is very significant. It strips the authority of the secretary when you allow a signatory to do what they're doing. Norris v. Stanley does not apply here. That's an example of Michigan State University. They didn't sign the agreement. They were not administering to their students. That's a completely different situation because the contract here was in place and it was agreed to by Shriners and the State of Texas. And Texas was the one that said that they were going to enforce it. A 12B6 motion is to be decided in a light most favorable to the plaintiffs, and that's what should be done here. Personal jurisdiction. There were duties that these members of the Board of Trustees owed. Ms. Bokovitz was equivalent to the CEO. Mr. Farley was the CMO. They signed the agreement. They signed the agreement. They had duties. The Board of Trustees knew that the entity entered into this agreement. And instead, what did they do? Instead of honoring their duty, they breached their duty, implemented a policy to be carried out in Texas. It caused damage in Texas. There's personal jurisdiction. And my time is up. All right. Thank you, sir. All right. Before we call up the third case, 24-20194, the panel will stand in a short 10-minute recess. All rise.